J-S45016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 502 EDA 2019 |

Appeal from the Decree Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-000061-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 509 EDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000842-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 510 EDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000762-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S45016-19

APPEAL OF: J.T., MOTHER

.
.
.
.
.
.
.
.
.

: No. 511 EDA 2019

Appeal from the Decree Entered January 22, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000841-2018

BEFORE: BENDER, P.J.E., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED SEPTEMBER 13, 2019**

J.T. (Mother) appeals from the decrees involuntarily terminating her parental rights to her minor daughters, S.N. (born January 2012) and N.N. (born August 2013) (Children) pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act; Mother also appeals from the orders changing the permanency goals for Children to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1] After careful review, we affirm.

The trial court recounted the factual and procedural history of this case as follows:

> [Philadelphia Department of Human Services (DHS)] originally became involved with this family on April 19, 2014. DHS received a General Protective Services ("GPS") report alleging that Children and their three siblings were residing in deplorable housing with Mother, who left them unattended; Mother begged for food from the neighbors; Children were cared for by one of their older

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The court also entered decrees involuntarily terminating the parental rights of Children's father, W.N. (Father). Father did not appeal the decrees terminating his parental rights, and has not participated in this appeal.

- 2 -

siblings when Mother was not around; Mother was believed to use drugs; there was no information regarding Children's father; Mother was having a difficult time caring for Children. This report was substantiated. In November 2014, In-Home Protective Services ("IHPS") w[ere] implemented for the family after Mother failed to appear for a truancy hearing for one of Children's siblings.

On March 24, 2015, DHS visited the family home. DHS observed a large hole in the living room due to a pipe leak in the bathroom. The ceiling looked as though it would fall through and the walls were not sturdy. There was a quilt, which was wet and moldy, on the floor to catch the water and the hardwood was warped. DHS also observed that the floor was extremely weak and could cave in at any moment. The home had electrical problems with no available lighting in the living and dining rooms. In the kitchen, there was no water coming out of the sink. The house had no heat or hot water. DHS learned that Mother used the four burners on the stove to heat the home, creating a safety hazard. There were several exposed wires in the kitchen. In the upstairs bedrooms, wires were hanging out of the ceiling. In one of the bedrooms, there was a full-size bed with sheets, and in the middle room, there was a full-size mattress that had a ripped plastic mattress cover on it with no sheets. The family did their cleaning and prepared their food in the bathroom. DHS observed utensils, pots, and pans in the bathroom as well as dried food on the floor and in the sink. The toilet seat cover was on the floor and the bathtub was very dirty. While DHS was in the home, Mother, Mother's five children, and three of the siblings' teenage friends were there. Mother stated that the smell in the home was from a Black and Mild cigar that she had previously smoked. Mother appeared to be under the influence of drugs. Mother's speech was slurred and she was stumbling. DHS subsequently requested police assistance. Mother was unable to provide DHS with possible placement resources for Children. On that same day, DHS obtained an Order of Protective Custody ("OPC") for Children and their siblings. Children were placed in foster care through the Community Umbrella Agency ("CUA") Wordsworth.

On March 26, 2015, a shelter care hearing was held for Children. Mother was present for this hearing. The trial court lifted the OPC, ordered the temporary commitment to DHS to stand, and referred Mother to the Clinical Evaluation Unit for a forthwith drug and alcohol screen and a dual diagnosis assessment. On April 7, 2015, an adjudicatory hearing was held for Children. Mother was present for this hearing. Children were adjudicated dependent

due to the present inability of Mother to care for Children. Children were committed to DHS and were referred to the Educational Support Center. Mother was referred to the CEU for a forthwith assessment and monitoring.

On June 22, 2015, an initial Single Case Plan ("SCP") was created. Mother's objectives were to complete a drug and alcohol program and follow all of the program's recommendations; complete random drug screens with negative results; sign a release of information so that the CUA case manager can receive updates on Mother's progress; participate in and complete the Achieving Reunification Center ("ARC") program and comply with the housing and employment requirements; and to comply with supervised visits at the agency.

Trial Court Opinion, 5/21/19, at 1-3 (footnotes and citations to the record omitted).

Since 2015, the trial court has conducted numerous permanency review hearings. At many of the review hearings, Mother was determined to be substantially compliant with the permanency plan. However, in August 2018, Mother's compliance with the permanency plan was minimal. On October 17, 2018, DHS filed petitions to involuntarily terminate Mother's parental rights, and to change Children's permanency goals to adoption. The trial court conducted the hearing on DHS's petitions on January 22, 2019. DHS presented the testimony of Tiffany Manderville, the CUA Turning Points for Children case manager. Children's legal counsel presented the testimony of Roya Paller, a forensic social worker.[2] Mother did not appear, but was represented by Attorney Andre Martino.

_____

[2] Children were represented at the hearing by Attorney William Rice and also had the benefit of a guardian *ad litem*, Attorney Alexandra Adams. Attorney

- 4 -

On January 22, 2019, the court entered decrees involuntarily terminating Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court also entered orders changing Children's permanency goals to adoption. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, J.T., under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, J.T., under 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, J.T., under 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, J.T., under 23 Pa.C.S.A. § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, J.T., under 23 Pa.C.S.A. §2511(b)?

6. Whether the [t]rial [c]ourt erred by determining it to be in the child[ren]'s best interest to change the goal from reunification to adoption?

---

Rice presented the testimony of Ms. Paller to establish that Children wished to be adopted by their paternal grandmother, who is their kinship foster mother. N.T., 1/22/19, at 22-25. As such, we find the requirements of 23 Pa.C.S.A. § 2313(a) were satisfied. *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

Mother's Brief at 5-6.

We review Mother's claims mindful of our standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). This Court may

affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b).  ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  Accordingly, we focus our analysis on Section 2511(a)(2) and (b), which provides:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

We first consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Mother contends that the trial court erred by involuntarily terminating her parental rights pursuant to Section 2511(a)(2) because she took steps to remedy her parental incapacity. Mother's Brief at 17-18. Mother argues that she was in full compliance with the permanency plan on multiple occasions and visited Children until November 2018. *Id.*

The trial court explained its decision to terminate Mother's parental rights under Section 2511(a)(2) as follows:

> Throughout the time that Children have been in DHS custody, Mother's SCP objectives were dual diagnosis, random screens, sign releases for her treatment program, housing, employment, parenting, provide a copy of the lease to her home, and to comply with visitation. These objectives remained substantially the same

throughout the life of the case. In regards to Mother's dual diagnosis objective[,] Mother is not currently engaged in any dual diagnosis treatment program. Mother has failed to attend her random drug and alcohol screens at the CEU. Mother has a history of drug abuse and her drug of choice was opiates. Mother has not recently engaged in housing, parenting, or employment at the ARC. Mother last attended in 2015 and then declined these services in 2017. Mother never provided CUA with a copy of her lease. In August 2018, Mother's visits were modified from liberal unsupervised to weekly supervised at the agency. In October 2018, Mother's visits were modified again to monthly supervised at the agency due to Mother's minimal compliance with the permanency plan. When CUA asked Mother why she was not visiting Children more often, Mother indicated that her work schedule did not permit more visits, although Mother never provided CUA with a copy of her work schedule. Mother has not attended a visit with Children since November 28, 2018. Mother had previously been close to reunification with Children in May 2018, but Mother "disappeared," which included Mother ending contact with CUA[,] and stopped visiting Children. As of August 14, 2018, Mother was minimally compliant with the permanency plan. For the life of the case, Mother has failed to successfully complete her objectives. Children need permanency, which Mother cannot provide. The conditions and causes of Mother's incapacity cannot or will not be remedied by Mother. Children have been adjudicated dependent since April 7, 2015, and Children have been in DHS care since March 24, 2015, forty-six months at the time of the termination trial on January 22, 2019. Mother has attended almost all of the court hearings in this matter and is aware of her SCP objectives. Mother had ample opportunity to put herself in a position to parent. Mother has demonstrated that she does not want to be a parent. Mother's repeated and continued incapacity has not been mitigated. The DHS witness was credible. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity to parent in order to provide Children with essential parental care, control, or subsistence necessary for their physical and mental well-being. Termination under 23 Pa.C.S.A. § 2511(a)(2) was [] proper.

Trial Court Opinion, 5/21/19, at 11-12 (citations to the record omitted).

Our review of the record supports the trial court's conclusion. Ms. Manderville testified that the family became known to DHS in April 2014 due to concerns regarding a lack of supervision and food, poor housing, truancy, and Mother's drug use, with her drugs of choice being opiates. N.T., 1/22/19, at 8-9. DHS obtained orders for protective custody on March 24, 2015, because the family's home had no utilities and was in disrepair, and Mother appeared to be under the influence of drugs. *Id.* Children were adjudicated dependent on April 7, 2015. Mother's SCP objectives were to obtain a dual diagnosis assessment, appear for three random drug screens, sign releases for medical information, attend ARC for housing, employment, and parenting, provide a copy of her lease, and comply with visits. *Id.* at 10. At the time of the hearing, the case had been open for almost four years and Mother had not completed any of her objectives. *Id.* at 10-11. Mother's services through ARC were closed in September 2015 because Mother failed to report for services, and Mother declined services in August 2017. *Id.* at 11. Moreover, Mother was not appearing for random drug screens and was not currently attending drug and alcohol or mental health treatment. *Id.*

Based on Mother's initial progress, Mother's visits with Children were, at times, liberal and unsupervised. *Id.* at 12. However, visits were changed to weekly supervised in August 2018, and to monthly supervised in October 2018, due to Mother's minimal compliance. *Id.* Ms. Manderville testified that Mother essentially "disappeared" after May 2018. *Id.* at 21.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The record comports with the trial court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we therefore need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

As to Section 2511(b), our Supreme Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as

- 11 -

discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

With respect to Section 2511(b), Mother contends that DHS did not meet its burden of proof, arguing, "[t]he evidence presented by [DHS] did not rise to the level of clear and convincing evidence as required by the applicable case law. The CUA worker stated that [M]other once had liberal unsupervised visits. When her visits became less frequent[,] [M]other reported that she had a job." Mother's Brief at 20.

Conversely, the trial court opined:

Children are currently placed together in Paternal Grandmother's ("PGM") home and they have been in this placement for nearly four years. This is a pre-adoptive placement. Children look to PGM for their care and support. PGM provides for Children's daily needs. Children share a parental bond with PGM. Children have been in PGM's care for the majority of their lives. Children would not suffer any irreparable harm if Mother's parental rights were terminated. It is in Children's best interest to be freed for adoption. Although Children once had a parental bond with Mother, that bond has been severed due to Mother's sporadic contact. In the last few months prior to the termination trial, Mother's frequency of visits diminished to the point that Mother stopped attending visits at all. Children were appointed Legal Counsel. On January 16, 2019, a forensic specialist visited the [c]hildren to determine their wishes regarding their placement. Children are five and seven years old, respectively. Children indicated that they are very happy in their current home. They indicated that they want to stay in PGM's home with each other.

> When asked about Mother, they indicated that they thought that they may return to her care because they believed that Mother "got a home." The forensic specialist indicated that Children were well cared-for in the home and were safe and loved. Children want to be adopted by PGM. The DHS witness and the forensic specialist were credible.

Trial Court Opinion, 5/21/19, at 16-17 (citations to the record omitted).

The record supports the trial court's conclusion regarding the Children's needs and welfare under Section 2511(b). Ms. Manderville testified that Children reside in kinship foster care with their paternal grandmother. N.T., 1/22/19, at 9-10. Children are bonded to their grandmother, and look to her as their primary caretaker. *Id.* at 15-20. While Ms. Manderville testified that Children previously had a bond with Mother, Ms. Manderville believed the bond was severed due to Mother's failure to visit. *Id.* Accordingly, she testified that Children do not have a parental bond with Mother. *Id.* She further opined that Children would not suffer irreparable harm if Mother's rights were terminated, and believed it would be in Children's best interests. *Id.* Likewise, Ms. Paller testified that Children expressed they are happy living with their grandmother and want to stay with her. *Id.* at 24. Further, Children's grandmother is an adoptive resource, and both children expressed their desire to be adopted by their grandmother. *Id.* at 25.

Contrary to Mother's argument, the credited testimony established the lack of a parental bond between Children and Mother. Children are bonded to their grandmother. We also note that preserving Mother's parental rights would serve only to deny Children the permanence and stability to which they

- 13 -

are entitled. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Accordingly, the trial court did not err in terminating Mother's parental rights to Children pursuant to Section 2511(b).

In her final issue, Mother argues that the trial court erred in changing Children's permanent placement goals to adoption. The Juvenile Act governs proceedings to change a child's permanent placement goal. *See* 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations omitted).

Mother argues that the trial court erred in changing Children's permanent placement goals to adoption because Mother was generally compliant with her SCP and only visited less frequently because of her employment. Mother's Brief at 21.

In rejecting Mother's argument, the trial court reasoned, in part:

> The record established by clear and convincing evidence that the court's change of Children's permanency goal from reunification to adoption was proper. Children need[] permanency, which Mother cannot provide. For forty-six months, DHS has attempted to assist Mother in order for her to gain the parenting capacity and ability to care for Children. However, Mother is unwilling and unable to apply herself to successfully complete all of her objectives. Children's permanency could no longer be put on hold. The trial court did not err or abuse its discretion when it changed the permanency goal from reunification to adoption.

Trial Court Opinion, 5/21/19, at 18.

Our review of the record supports the trial court's finding that a goal change to adoption was in Children's best interests. At the time of the proceedings, Children had been in foster care for nearly four years, during which Mother failed to demonstrate her ability to parent. It is clear that Mother was and is unable to provide Children with a safe and permanent home. Therefore, we discern no abuse of discretion by the court in changing Children's permanent placement goals from reunification to adoption.

For the foregoing reasons, we affirm the decrees terminating Mother's parental rights, and the orders changing Children's permanent placement goals to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/13/19</u>